**In the Matter of NAFTALIN & CO., Inc., a Minnesota corporation, Alleged Bankrupt.**

**Nos. 4–70 BKY 137, 4–70 BKY 170.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 27, 1971.

O'Connor, Green, Thomas, Walters & Kelly, by Joe A. Walters and Frank J. Walz, Minneapolis, Minn., for alleged bankrupt.

Richards, Montgomery, Cobb & Bassford, by L. H. May, Jr., and Jon D. Jensvold, Minneapolis, Minn., for petitioning creditors Merrill Lynch, Pierce, Fenner & Smith and Paine, Webber, Jackson & Curtis.

Faegre & Benson, by Bruce F. Burton, Minneapolis, Minn., for petitioning creditor Piper, Jaffray & Hopwood, Inc.

Mackall, Crounse, Moore, Helmey & Holmes, by Clay R. Moore, Minneapolis; Minn., and Schiff, Hardin, Waite, Dorschel & Britton, by Burton R. Rissman, Chicago, Ill., for petitioning creditors H. S. Kipnes & Co., Donaldson, Lufkin & Jenrette, Inc. and Francis I. duPont & Co.

## ORDER ON REVIEW OF ORDER AND FINDINGS OF REFEREE IN BANKRUPTCY

NEVILLE, District Judge.

Before the court at Minneapolis, Minnesota, on May 7, 1971, came the petition of Naftalin & Co., Inc. (Naftalin), an alleged bankrupt, to review an order of the Referee in Bankruptcy dated March 29, 1971 adjudicating it a bankrupt, and finding that it is indebted to each of the six petitioning creditors, all stock brokerage houses, in the amount of the monetary loss sustained by each in transactions had with Naftalin. The referee very ably has made extensive, meticulous and complete findings of fact and conclusions of law.

This case was before this court previously, see In re Naftalin & Co., Inc., 315 F.Supp. 463 (D.Minn.1970), and the broad outline of the facts are set forth therein. In that opinion and accompanying order the court denied Naftalin a jury trial under 11 U.S.C. § 42 on the issue of insolvency and the commission of an act of bankruptcy, and referred the case as in due course to the Referee in Bankruptcy. The Referee held extensive hearings, and the case again is before this court on review of his order and findings.

The Referee found that on various dates in late July and in August 1969 Naftalin sold through some 27 different stock brokerage houses [1] located at various places in the United States in excess of $10,000,000 of various listed stocks, none or very few of which, if any, it owned. Clearly it was speculating by selling "short", gambling and predicting that market prices would decline

1. The 27 brokerage houses include the six presently petitioning to adjudicate Naftalin a bankrupt. February 10, 1970, three brokerage houses, Merrill Lynch, Pierce, Fenner & Smith of New York; Paine, Webber, Jackson & Curtis of New York; and Piper, Jaffray & Hopwood, Incorporated of Minneapolis filed a petition in bankruptcy alleging "provable claims * * * amounting in the aggregate to $500.00 * * *" and seeking to have Naftalin & Co., Inc., a Minnesota corporation at one time engaged in the stock brokerage business, adjudged an involuntary bankrupt. February 18, 1970, eight days later, three other brokerage houses, H. S. Kipness & Co. of Chicago; Donaldson, Lufkin & Jenrette, Inc. of New York; and Francis I. duPont, of New York City filed a separate petition with similar allegations and seeking the same relief. The Referee quite properly consolidated the two petitions.

so that later it could purchase the stock in the market before the time required to make delivery on the "short" sale, and thereby realize a profit. Contrariwise, the market rose. Two to three months later, and on or about October 27, 1969, the "bubble burst" and the various brokerage houses, which in the meantime had "lent" stock for delivery to the purchasers on the other end of the Naftalin "short" sales, "bought in" Naftalin at the then market price, which was substantially higher than the earlier "short" sale price. Since the market had risen, each of the 27 houses thus suffered a financial loss and accrued a claim against Naftalin, which is unpaid. The claims total some $1,200,000.

The question presented for decision is whether the brokerage houses in executing "short" sales for a customer, when the securities were not in their hands and did not reside in the customer's accounts with them, violated the Federal Securities Act of 1934, particularly 15 U.S.C. § 78g and regulations promulgated thereunder, either by effecting such sales or later by not liquidating the customer's transactions by timely "buy-ins" as soon as it became a "fail" seven business days after executing the sell orders, and whether such inaction created illegal extensions of credit prohibited by the act so that the contracts with Naftalin are void, and thus the six brokerage houses who are the petitioning creditors in an involuntary bankruptcy proceeding against the customer do not have " * * * provable claims—amounting in the aggregate to $500. * * * "

The Referee found the six brokerage houses to have standing as petitioning creditors and their claims to be valid; further that Naftalin was and is insolvent and had committed an act of bankruptcy.

The findings are that Naftalin was incorporated in 1960 by one Neil T. Naftalin and two associates; that it registered as a securities dealer with the Federal Securities and Exchange Commission as required by 15 U.S.C. § 78a and as a broker-dealer with the Minnesota Securities Division pursuant to Minn.Stat. Chap. 80; that it became a member of the National Association of Securities Dealers (NASD), though it was suspended therefrom for a short period in 1964; that in and after 1964, although it continued to maintain its governmental registrations and its membership in NASD, it substantially ceased doing public business, that is brokering or trading for others, but continued to purchase and sell securities for its own account; that from that time on Neil Naftalin "maintained substantially a one-man office * * * and from thence on continued to be in complete and effective control of its investment decisions, policies and procedures." Commencing in 1966 Naftalin engaged "in a series of so-called 'short selling cycles'" which, until July and August 1969, were quite successful and profitable to Naftalin, and were ultimately closed in each instance by making the covering purchases; "Neil [Naftalin] was astute and effective in reading market conditions * * * prior to the final 'fatal' cycle, commencing the last few days of July and extending through August 1969".

The Referee further found that Naftalin's records were scanty and incomplete, and that all or nearly all of the "short" sale orders were placed with the various houses by Naftalin by telephone; that in no case did Naftalin disclose the fact that it did not own the securities it was ordering sold, and when questions were directed to Neil Naftalin on this subject such were skillfully avoided, parried, or false answers were given without a direct answer.[2] In no case, save perhaps one, did

2. In response to any inquiries by the brokerage houses' representatives, Neil Naftalin would state that the stock had been purchased in the third market, meaning a transaction effected off the recognized exchange, that the stock was in the course of

being split, or carried due bills, and accordingly delivery would be delayed. Clearly as a broker-dealer Naftalin was familiar with the law and the rules and regulations applicable, knew that only cash transactions could be effected

the brokerage house have the stock sold in its account.

The Referee found, and the court has confirmed the same by examining the actual exhibits, that of the various written sale confirmations sent to Naftalin from the brokerage houses, clearly amounting to contracts, all contained "settlement" dates or "payment" dates calling for delivery of the securities within seven calendar days after the placing of the sell orders.[3] In no case did Naftalin come close to honoring these dates. In every case Neil Naftalin, in placing the sell order for Naftalin, was very careful to specify a "special cash" account (as distinguished from a margin or some type of special account), and the various houses so carried the account.

October 27, 1969, Naftalin called a meeting in New York of all the brokers involved, and advised that he did not own nor have available for delivery the securities which he had sold. Forthwith all of the houses liquidated the Naftalin accounts and "bought in" the various securities, with a substantial net loss in each instance. The Referee's findings are unpublished, but reference is made thereto for a far more extensive statement of the detailed facts.

■ This court has in mind that in reviewing the decision of a Referee in bankruptcy, his findings will be accepted unless clearly erroneous.[4] This test obtains as to facts found, but not necessarily as to legal conclusions to be reached or drawn from the facts so found. It is for the most part in this latter respect that the court differs with the Referee, and thus cannot affirm or adopt his findings and conclusions in a number of respects.

■■ The Securities Act of 1934, 15 U.S.C. § 78g[5] prohibits the extension by brokerage houses of credit in contravention of such rules and regulations as may be prescribed by the Board of Governors of the Federal Reserve System. 15 U.S.C. § 78cc[6] provides that any contract made in violation of the Securities Act, or any rule or regulation thereunder "shall be void as regards the rights of any person who, in violation of such provision, rule, or regulation, shall have made or engaged in the performance of any such contract." Regulation T was

---

through such accounts as he carried and that such were available only to a customer who had the securities and intended promptly to deposit them.

3. The following were typical inscriptions on the transaction confirmations: "DELIVERY OF SECURITIES SOLD ARE DUE ON SETTLEMENT DATE," "DELIVERY OF SECURITIES SOLD REQUIRED AT OFFICE WHERE TRANSACTION WAS MADE BY THIS DATE-SETTLEMENT," and "FEDERAL REGULATIONS REQUIRE THAT YOUR SECURITIES BE DEPOSITED WITH US BY THE DATE INDICATED ABOVE-PAYMENT DATE."

4. O'Rieley v. Endicott-Johnson Corp., 297 F.2d 1, 4 (8th Cir. 1961). See General Orders in Bankruptcy, Order #47 as to this standard.

5. 15 U.S.C. § 78g provides in applicable part as follows:
"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—
(1) On any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section;
* * *."

6. 15 U.S.C. § 78cc provides in pertinent part:
"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. * * *"

promulgated by the Board of Governors of the Federal Reserve System pursuant to the above authority and it provided at the time of the transactions here in question in applicable part:

"(c) Special cash account. (1) In a special cash account, a creditor may effect for or with any customer bona fide cash transactions in securities in which the creditor may:

(i) *Purchase* any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will *promptly* make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment.

(ii) *Sell* any security for, or purchase any security from, any customer, provided the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be *promptly* deposited in the account.

(2) In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security *within 7 days* after the date on which the security is so purchased, the creditor shall \* \* \* promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof." SEC Reg. T, 12 C.F.R. § 220.4 (1969). [Emphasis added.]

At the threshold of an inquiry into the applicability of Regulation T to the case at bar is the question that arises because the purchase or buy side of § 220.4(c) (1) (i) above has a seven day liquidation provision contained in paragraph (c) (2) unlike the sell side of § 220.4(c) (1) (ii) which specifies no number of days, but merely uses the word "promptly". Naftalin contends that the Referee erred by not finding an analogy to the seven day payment provision applicable to purchases, and by ignoring the settlement dates on the sales contracts in assessing promptness. The court is not persuaded that the regulation which defines prompt cash payment in terms of a specified number of days relating to purchases provides no equivalent definition for "prompt" in relation to a deposit in the account of stock sold.[7]

■ The meaning of the word "promptly" as used in Section 4(c) (1) (ii) above quoted has been brought into question. At some time prior to 1969, Regulation T had provided seven days on the sell side as well as on the buy side, but such later was eliminated. From this it is urged that "promptly" means either (1) a shorter time than seven days or (2) a somewhat longer time according to the exigencies of the situation

---

7. The court is not persuaded that the respondents are protected by a saving clause which immediately follows in 15 U.S.C. § 78cc(c):

(c) Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit \* \* \* prior or subsequent to June 6, 1934, unless at the time of the making of such loan or extension of credit \* \* \* the person making such loan or extension of credit \* \* \* shall have actual knowledge of facts by reason of which the making of such loan or extension of credit \* \* \* is a violation of the provisions of this chapter or any rule or regulation thereunder \* \* \*.

The brokers argue that because they did not know that Naftalin did not own the securities sold, they had no "actual knowledge of facts" which rendered their extension of credit unlawful. The "fact" that Naftalin did not own the securities sold are not the facts that made the respondents' conduct in the sale transactions unlawful. The brokerage houses had actual knowledge that Federal Regulations were being violated when they did not receive the securities from Naftalin on the settlement date whether or not he owned them. It is this "actual knowledge of facts" by reason of which the respondents' extentions of credit were in violation of the law.

and/or the customs and practices of the industry. Since no emergency existed here,[8] assuming *arguendo* that "promptly equates with the customs and practices of that industry, the brokerage houses themselves provided a seven-day settlement date in their confirmations, and these were received and accepted by Naftalin. Certainly this is evidence of the brokers' understanding of the custom of their trade and their unwillingness to provide otherwise.[9]

Stress is placed on the Referee's finding, with which this court is in accord, that the brokerage houses were not informed that Naftalin did not own the stock sold at the time the sell orders were placed, and the court agrees that originally "the purchase or sale is in reliance upon an agreement accepted by the creditor (the stock brokerage houses) in good faith that the security is to be promptly deposited in the account".

■ Argument has been made that since Naftalin had dealt with many if not all of these houses on a number of prior occasions since 1966, and had rarely or never made delivery within 7 days and sometimes not for two or three months, that the various houses knew or well should have known, or at least suspected, that Naftalin did not own the stock he was selling, and therefore it is urged they could not have been in good faith from the very beginning; that therefore the contracts were void from the moment the sell orders were placed and accepted. The Referee found to the contrary, and the court cannot say this is clearly erroneous, as applied to the acceptance of the sell order, particularly

since Naftalin never informed that it didn't own the stock and when queried, falsified its answers and was not frank. Further, Naftalin was a broker dealer, a member of NASD, and on receipt of a sell order a registered representative in a brokerage office well could be acting originally in good faith in believing the security would promptly be deposited.

There is no question, however, and here the court disagrees with the Referee, but that after seven days, the specified settlement date in all of the contracts, the claim of good faith by the brokers is extremely thin. As the period of two months, or in some instances nearly three months, passed the brokerage houses had to realize they were extending credit to Naftalin. On the morning of the eighth day they knew that Naftalin had become a "fail", and had not deposited the securities. Assuming *arguendo* the brokers had the right for seven days, in good faith, to believe that the securities were going to be deposited, they knew, by "failing" on the eighth day, that if they did not "buy in", they were extending credit to Naftalin. Any finding of the Referee to the contrary on this point the court does not believe is sustained by the evidence.

■ The fact that Naftalin, albeit a one-man operation, was a registered broker dealer does not change its status as a "customer" of the brokerage houses in the same status as any individual who maintained a "special cash account." To the extent that the findings of the Referee are to the contrary on this point, his findings and conclusions are not adopted. The cloak of a broker-dealer

8. The only possible exigency is the so-called "paper crunch" said to have existed during the years 1968 and 1969 when the volume of trading on the New York Stock Exchange reached record highs. No one asserts that this condition in any way impeded the brokerage houses from "buying in" immediately after the settlement dates when Naftalin became a "fail", but it is advanced as giving credence to the excuses advanced by Naftalin when inquiry was made as to why he failed to make deposits of the securities sold

"short". While the Referee's findings as to the facts of the "crunch" are supported by the evidence, the court does not agree with the conclusion reached that this created an exigency excusing the brokerage houses from timely "buying in".

9. Regulation T, 12 C.F.R. § 220.4(c) (7) reads "The 7 day periods specified in this paragraph refer to 7 full business days." The brokerage houses in their confirmations designated 7 calendar days as settlement or payment dates.

in a one-man operation such as this does not hallow Naftalin so that it is exempt from laws, rules and regulations that apply to others.

The real question for decision then relates to the effect of 15 U.S.C. § 78g declaring contracts involving the extension of credit under certain circumstances void. A look at the history of, and the purpose behind, the Securities Acts of 1933 and 1934 is of value.[10]

The Securities Acts grew out of the economic depression era of the early 1930's, following the 1929 stock market crash which was thought by some or many to have triggered the depression era. Congress sought and intended to regulate the securities industry and obviously recognized that to a greater or lesser degree it must rely on self-enforcement and self-regulation. Congress placed the onus of compliance on the stock brokers and on the securities industry generally, for there are few, if any regulations running to or proscribing conduct of the investor. Regulation T for instance, speaks in terms of conduct and action permitted and prohibited by brokerage houses, and not of investors. Large credit extensions, whether by the use of margin or cash accounts where insufficient margins are posted or where, as at bar, no deposit of cash or of the securities is promptly made, defeat one of if not the main purpose of the Securities Acts. How many potential investors can sell "short" to the extent of $10,-

000,000 as did Naftalin, and become a "fail" without substantially affecting the market? Such practices can be stopped only by the brokerage houses themselves recognizing their responsibility to abide by the law and the regulations. Congress provided that contracts for credit extension not in compliance with the law and regulations are void, not merely voidable. Congress intended to prevent just what happened in the case *sub judice*—expanding falsely the volume in the securities market by a "paper" gamble of $10,000,-000.

15 U.S.C. § 78g(a) states that the Act is "For the purpose of preventing the excessive use of credit for the purchase or carrying of securities * *." The Congressional history evidences the primary concern of Congress to have been to prevent excessive speculation in the market by the use of credit transactions.[11] A secondary purpose is the protection of the investor.[12]

A recent decision of the United States District Court for the District of Columbia bears directly upon some of the considerations involved in the case at bar. Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677 (D.D.C.1971), a suit by a customer to recover a loss occasioned where the broker had sold short at the customer's request but without the required margin deposit in the customer's account. This is of course distinguishable on its facts from

---

10. It would seem to the court that the case might be disposed of on the common law grounds that the parties are in *pari delicto*, though some doubt may have been cast on this doctrine at least where an investor sues a broker by analogy to the anti trust case of Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) ; see Pearlstein v. Scudder & German, (2d Cir. 1970) 429 F.2d 1136 at p. 1141. Here however the parties asserting their claims are the brokerage houses whom this court believes to be in violation of the law and regulations and so not having clean hands should not be able to enforce their contracts. The court does not however rest its decision except inferentially on this ground.

11. "The main purpose is to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation in the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise be available at normal interest rates for uses of local commerce, industry and agriculture were drained by far higher rates into security loans and the New York call market." Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. at 678–679.

12. Pearlstein v. Scudder & German, 429 F. 2d 1136, 1140 (2d Cir. 1970).

the case at bar.[13]  Nevertheless, the principles enunciated therein appeal to this court as being a correct statement of the applicable law:

"The Court will not entertain a cacophony of blame on the part of the brokers and customers—each blaming the other for not meeting the requirements—the ultimate responsibility must be placed somewhere and Congress has indicated that it is with the brokers or dealers.  The Court concludes that civil liability is a helpful and beneficial adjunct to criminal and administrative sanctions in implementing the purpose of the Act, namely, deterring excessive credit transactions.  It appears that in the instant case it may well be true that the plaintiff was not an 'innocent "lamb" attracted to speculation by the possibility of large profits with low capital investment,' but rather was aware of the margin requirements and nevertheless disregarded them.  The Court deplores this type of alleged investor behavior and were not the mandate of Congress so unequivocal and the public policy considerations so strong, the Court might reach a substantially different decision than the one it does.  The participation, however, by plaintiff is not enough to relieve the defendant of its squarely imposed statutory duty, and hence the Court concludes that the plaintiff's motion for summary judgment should be granted."  328 F.Supp. at 681.

*Avery* further observed:

"To allow the broker to plead contributory negligence or causation by the customer as the reason for a violation would remove the very heart of the legislation, for in every case of a violation the dealer could be heard to assert participation.  The duty of the broker is made completely clear by the Regulation—if the investor has not made sufficient deposit to meet the margin requirements within the five-day period, the broker is required to liquidate in order to cover the position."  328 F.Supp. at 680.

■  This court concludes that the "onus of compliance" with the federal regulations should be and is on the brokers and dealers, and not on their customers.  See, Pearlstein v. Scudder & German, 429 F.2d 1136, 1141 (2d Cir. 1970).  Another case states "It appears that the regulation places the entire burden of observing the margin requirements on the lender."  Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 77 (S. D.N.Y.1968), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969).  (Regulations T and U.)  "No duties or restrictions were imposed by the Act and the Regulation upon the investor-customer."  See, Moscarelli v. A. L. Stamm & Co., 288 F.Supp. 453, 458 (E.D.N.Y. 1968) (Regulation T).  "Unlike the antitrust laws which forbid both seller and buyer to enter into a proscribed transaction, the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit."  *Pearlstein, supra,* 429 F.2d at 1141.

The court concurs with the majority in *Pearlstein, supra* at 1141, and *Avery, supra:*

"In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission."

*A fortiori,* the concern of Congress in preventing excessive speculative credit transactions, and the regulations which relate thereto as to cash accounts and

---

13. The court is not unaware that Naftalin is not suing for damages for the brokers' violation of margin requirements.  Rather, it is Naftalin who is defending claims asserted by the brokers, predicated upon breach of contract, by arguing that the contracts evidence a pattern of violations of the regulations and statutes by illegally extending credit.

short sales, outweigh the danger of permitting a "windfall to an unscrupulous investor."

It is extremely distasteful to this court to hold that the violation of the federal regulations by members of the industry can be used defensively by a completely and wholly undeserving, sophisticated and knowledgeable customer such as Naftalin.[14] The court concludes, however, that such a holding, as harsh as it may seem, is consonant with the objectives and purposes of the 1934 Securities Exchange Act. Further, had the brokerage houses followed what this court deems to be the clear mandate of the law as evidenced by their own self-designated payment or settlement dates, their losses might well have been less.

The necessity of putting teeth into the legislative policy of effective credit regulation in the securities industry outstrips the worth of any customer. Brokers should not be permitted to ignore regulations applicable to them. To so hold would give the brokers a license to continue their activities with court sponsorship. Neil Naftalin may be and undoubtedly is a rascal and deliberately put the brokerage houses in the position in which they find themselves today. To allow him to avoid the consequences of his deliberate and fraudulent actions is quite undesirable, but outweighed by the considerations above, and the fact that the brokerage houses had they abided the law could in large part have prevented their losses.

The Referee's finding that Naftalin permitted and suffered the appointment of a Receiver in November 1969 in a proceeding brought by the Securities and Exchange Commission is clearly supported by the evidence and it would seem, if it was then insolvent,[15] that the finding clearly is supported by the evidence.

Accordingly, and on the basis of the above,

It is ordered that the case is re-referred to the Referee in Bankruptcy with directions to determine, after a further hearing or otherwise, the amount of loss which each of the six petitioning creditors would have suffered as to each of their transactions had they liquidated Naftalin's short sales and bought in the stock sold short at the opening of the market on the eighth business (not calendar) day following the placing of the short sell order by Naftalin, (not including in such calculation the day the sale order was placed). When this has been determined, the Referee then should determine which, if any, of the six petitioning brokerage houses are in fact creditors of Naftalin and shall thereby and thus determine the question as to their standing to petition for involuntary bankruptcy. The Referee shall further thereafter re-examine and make a determination as to the solvency or insolvency of Naftalin as of the time of the institution of the Securities and Exchange Commission receivership in November 1969 and as of the time of the filing of the involuntary petitions in bankruptcy, or at any other relevant date.[16]

14. This is not a case where the investor against whom the Regulations do not run is suing a broker, but rather the reverse, since here brokers are affirmatively asserting claims against the investor by way of becoming petitioning creditors in bankruptcy. The court need not opine on what Naftalin's position would be were it to sue the brokers, but based upon the Referee's findings of fraud on the part of Naftalin which appear to be well substantiated by the evidence, any such claimed rights on the part of Naftalin certainly would run head on against the decisions and the language found in *Pearlstein, supra*; Moscarelli v. A. L.

Stamm & Co., 288 F.Supp. 453 (E.D.N.Y. 1968) ; and Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968).

15. Bankruptcy General Order 47 confers on the Judges of the United States District Court, if it would not otherwise have such power and jurisdiction, the authority on review of a Referee's findings to recommit the case with instructions. This the court is doing in this case.

16. Testimony before this court at the time of the hearing on Naftalin's request for a jury trial on April 10 and 11, 1970 was received from the receiver appointed in

The Referee denied a motion to stay administration of the alleged bankrupt's estate. A trustee in bankruptcy has been appointed. The Referee's order in this regard is affirmed, and Naftalin's motion directed to this court to stay all proceedings in the bankruptcy court is denied; provided that if on a re-examination and re-determination as above, the Referee finds either that less than three of the six of the petitioning creditors have standing or that Naftalin Company is not insolvent, then the Referee shall of course be free to dismiss the involuntary bankruptcy proceedings.

It is so ordered.

the SEC proceedings. He testified he had $28,000 in assets and knew of only approximately $1,200 in debts (exclusive of amounts due various stock brokers). See, In re Naftalin & Co., 315 F.Supp. 463 at 466 fn. 3 (D.Minn.1970). The court is of course not advised nor able to determine how much of the aforesaid $28,000 if any will or should become assets of the bankrupt's estate nor whether proofs of claim have been or will be filed in the bankrupt's estate in excess of $1,200, but the Referee, in making a determination of solvency or insolvency un-doubtedly has or will consider these facts. Reference is made on p. 17 of the Referee's findings to a $25,000 to $26,000 collection of State tax refund by the Receiver. The Referee did find Naftalin insolvent, irrespective of the various brokerage house claims, with liabilities of $5,500 to general trade creditors, and with current assets substantially less. "Accordingly, in the equity sense of inability to meet bills, the condition existed without regard to the claim of the petitioning or other brokers."