Robert A. POWERS and Stasia C. Powers

v.

FRANCIS I. DuPONT & COMPANY.

Civ. A. No. 69-2977.

United States District Court,
E. D. Pennsylvania.

June 12, 1972.

Murray C. Goldman, Philadelphia, Pa., for plaintiffs.

Charles M. Solomon, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

MASTERSON, District Judge.

Plaintiffs have brought this action under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., to recover $28,000 which they lost in speculative activity in securities while trading through the defendant, Francis I. Dupont & Co., a member firm of the New York Stock Exchange which acts as a broker to buy and sell securities on behalf of its customers through the facilities of various national securities exchanges. Plaintiffs' contention is that but for several violations of the Securities Exchange Act in defendant's management of their trading accounts, these losses would not have been suffered. Specifically, it is alleged that the defendant "churned" plaintiffs' accounts, generating commissions from excessive speculative activities through transactions for which authorization had not been given. Defendant, while conceding excessive activity in the accounts, contended that all transactions were specifically authorized by plaintiff, Robert A. Powers. Therefore, the result turns upon an assessment of the credibility of the plaintiffs and defendant's employees who managed the accounts. The case was tried before the court without a jury on April 27, 1972, and we have resolved the issue against the plaintiffs.

## FINDINGS OF FACT

1. On or about May 1, 1968, the plaintiff Robert A. Powers, opened a cash account for the purchase and sale of securities with defendant, Francis I. Dupont & Company.

2. Shortly after opening the account, plaintiff Robert A. Powers terminated his executive position with Xerox Corporation and thereafter spent considerable time in the offices and board room of Francis I. Dupont & Company, devoting a great deal of attention to the available prospects for speculation in securities.

3. The account of plaintiff Robert A. Powers reflects excessive activity for his initial investment of less than $6,000.

4. Plaintiff gave orders for all transactions in his account and no orders were left to the discretion of defendant's account executive, Edward M. Schellenger, Jr.

5. On November 26, 1968, plaintiff Robert A. Powers ordered defendant to

open a new account for his wife, Stasia C. Powers, so that a new issue of stock could be entered in her account.

6. By March 1969, plaintiff Robert A. Powers was so heavily invested in his own account that he was unable to comply with a call for additional margin and the securities held in his account were sold at the market price resulting in an extensive loss.

7. Thereafter, plaintiff Robert A. Powers continued to speculate heavily by placing orders in his wife's account. Defendant requested and obtained a trading authorization signed by Stasia C. Powers, empowering Robert A. Powers to place orders for trades in her account.

8. Plaintiff Robert A. Powers spent considerable time in the defendant's offices and board room during the months he traded in his wife's account, devoting a great deal of attention to available prospects for speculation in securities.

9. The account of Stasia C. Powers reflects excessive activity for an initial investment of less than $10,000, but plaintiff Robert A. Powers gave the orders for all transactions in her account and no orders were left to the discretion of defendant's account executive, Edward M. Schellenger, Jr.

10. In April 1969, pursuant to instructions given by plaintiff Robert A. Powers, defendant opened an account for himself and his wife as joint tenants.

11. During May and June of 1969, plaintiff Robert A. Powers suffered losses of several thousand dollars while speculating in the joint account. Plaintiff, Robert A. Powers, gave the orders for all transactions in the joint account and no orders were left to the discretion of defendant's account executive, Edward M. Schellenger, Jr.

12. Plaintiff, Robert A. Powers, was warned several times by defendant's representatives as early as 1968 concerning his excessive speculative activities.

13. Defendant's account executive, Edward M. Schellenger, Jr., had known plaintiff, Robert A. Powers, for some five years prior to the opening of these accounts, but was misled as to Mr. Powers' financial capacity to absorb these financial losses.

14. All but 12 of the 166 orders for purchase or sale of securities in these accounts were initiated by plaintiff, Robert A. Powers, with no recommendation from defendant's account executive, Edward M. Schellenger, Jr.

15. Plaintiffs received written confirmations of all transactions in the accounts.

16. Sometime in June 1969, all trading in the above-mentioned accounts was terminated by defendant.

17. Plaintiff Robert A. Powers was a mature business man who decided to continue to speculate in securities after repeated admonitions that such excessive speculative activity might produce catastrophic results.

## DISCUSSION

The "churning" of a securities account occurs when a dealer, acting in his own interests and against those of his customers, induces transactions in the customer's account which are excessive in size and frequency in light of the character of the account. E. g., Looper & Co., 38 S.E.C. 294, 296 (1958); See generally, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). While there is no specific mention of churning in the Securities Exchange Act, the Securities Exchange Commission has promulgated Rule 15(a)-1-7 [1] defining the Act's prohibition of any "manipulative, deceptive, or other fraudulent device or contrivance" [2] as including

"Any act of any broker or dealer designed to effect with or for any customer's account, in respect to which such broker or dealer or his agent or employee is vested with any discre-

---

1. 17 C.F.R. § 240.15c1–7a.

2. 15 U.S.C. § 78o.

tionary power, any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of the account."

Although most cases involving charges of churning have been dealt with by the Securities and Exchange Commission through its enforcement of the anti-fraud provisions of the Securities Act,[3] the courts have also held in private damage suits that this type of activity by the broker constitutes an actionable fraud within the meaning of these provisions. Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968), affirmed and modified, 430 F.2d 1202 (9th Cir. 1970); Lorenz v. Watson, 258 F. Supp. 724 (E.D.Pa.1966); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968).

■ It is fairly clear from these cases that control by the dealer over the account is essential to a finding that the account has been churned. Over trading, *per se*, in an account in which the transactions are initiated by a customer does not constitute churning in the absence of any fiduciary relationship. Moscarelli v. Stamm, *supra* at 457; Thomson v. McKinnon, 35 S.E.C. 451 (1953); 3 Loss, Securities Regulation, 1479–80 (2nd Ed. 1961). The *Thomson* case, whose facts are similar to those in this case, is the only written SEC opinion on churning which did not find it present. The SEC noted that the customer had initiated the relationship, spending most of his time at the firm's office, doing his own research and advising others on investments. Only one of his twenty-five orders was recommended by the broker. Since these actions indicated that the dealer had not exercised control over the transactions, the SEC ruled that he was not responsible for the losses generated by the large volume.

■ Plaintiff, Robert A. Powers, tried to convince the court that he had been a naive and unsophisticated customer, that he invariably relied on the defendant's recommendations, and that unauthorized transactions went through his account generating substantial commissions for defendant. If accepted, this testimony would have established a classic example of churning. However, plaintiff has failed to persuade us that this description of the state of affairs is accurate. To summarize the above findings, we have concluded that Mr. Powers authorized all of the transactions that went through his accounts, that he personally initiated almost all of the orders without recommendations from defendant, and that he misled defendant as to his financial capacity to absorb these net losses.

Anticipating the possibility of such an adverse conclusion as to his client's credibility, plaintiffs' counsel has cited cases which, he argues, hold that there is no defense for violations of the Securities Exchange Act even though the plaintiff-customer is partly responsible. For example, it was recently suggested in In Re Naftalin & Co., 333 F.Supp. 136 (D. Minn.1971), that where brokerage houses violated the Securities Act in executing improper "short" sales for a customer, the customer's culpability or involvement in the transactions was not a defense as to civil liability.[4] See also Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677 (D.D.C.1971). However, plaintiffs' reliance on these cases is misplaced. In both *Naftalin* and *Avery*, there was no doubt that the securities regulations had been violated by the broker. In this case in which plaintiffs seek to recover because the broker allegedly churned the accounts, it is their very involvement which takes the concededly excessive activity out of

---

3. E. g. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b).

4. It is important to note that in *Naftalin*, the brokers were affirmatively asserting claims against the investor by way of

becoming petitioning creditors in bankruptcy. The court clearly intimated that the result would be altered if the customer were to sue the broker to recover his losses. 333 F.Supp. at 145, n. 14.

the prohibited area contemplated by the regulations.

■ Furthermore, it was held in the very case on which plaintiffs place primary reliance that

". . . since the purpose of the Securities Exchange Act is to protect the innocent investor, as distinguished from one who loses his innocence and waits to see how his investment turns out before he decides to invoke the act, estoppel and waiver are defenses to a civil action under the act and also that, since there is no applicable statute of limitations, the doctrine of laches is also a defense.

". . . Investors who repeatedly accept confirmations and statements disclosing the essentials of transactions with salesmen of brokerage partnerships, thereby indicate an election not to rely on any breach of duty imposed by the act and that such investors, failing seasonably to make complaints concerning reasonably discoverable facts, are barred by waiver, estoppel and laches from later assertion of wrongdoing."

Hecht v. Harris, Upham & Co., *supra,* 283 F.Supp. at 428. Even if we had accepted much of plaintiffs' testimony as to the transactions in question, it is clear that Mr. Powers had sufficient. knowledge and experience to put him on notice that his accounts were being handled in a manner contrary to his claimed understanding and instructions. His testimony convinces us that such notice was apparent soon after the first account was opened, and we hold that plaintiffs are now barred on these grounds as well.

Although verdict will be entered for the defendant, its professional conduct, while falling short of that prohibited by existing law, raises serious questions as to the responsibility of the broker to its customer. The question brought to mind by the evidence in this case is, should the broker permit a compulsive investor to continue to trade through its facilities when it has become clear that his speculative activity has crossed the line between intelligent risk taking and irrational gambling? We are reminded of the established body of law which limits the bartender's discretion in selling to an obviously inebriated alcoholic.

Frankly, even though we have concluded that it was misled as to plaintiffs' capacity to absorb the losses, we are surprised that defendant permitted Mr. Powers to continue his frantic trading as long as it did before closing the accounts. However, we fear that to permit civil liability in this type of situation would provide an "insurance policy" to the unscrupulous investor who would obviously be given an incentive to assume greater risks in the securities market, engaging in excessive activity far beyond his means. This is a clear example of a case in which governmental scrutiny and control are necessary to prevent the unfortunate waste of financial resources such as plaintiffs have brought upon themselves here.

The above constitutes our conclusions of law.