**UNITED STATES of America,
Plaintiff,**

v.

**William VAN de CARR et al., Defendants.**

**No. 7788.**

United States District Court,
C. D. California.

May 18, 1972.

Robert L. Meyer, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Chief Crim. Div., Richard L. Jaeger, Asst. U. S. Atty., and Dennis White, S. E. C., Los Angeles Staff Atty., for plaintiff, United States.

Thomas R. Sheridan and William R. Willis of Simon, Sheridan, Murphy, Thornton & Medvene, Los Angeles, Cal., for defendant, William Van de Carr.

## MEMORANDUM OPINION

HAUK, District Judge.

### PRELIMINARY STATEMENT

We have before the Court a rare criminal prosecution charging violations of the Federal Reserve Board's credit regulations setting forth the margin rules preventing the excessive use of credit for the purchase or carrying of securities—Regulations T [1] and U.[2] So far as the Court can determine, this is the first such criminal prosecution to go to trial since the Regulations were promulgated more than thirty years ago pursuant to Section 7 of the Securities Exchange Act of 1934.[3]

Initiating the prosecution by way of a 10-count indictment, the Government later filed a 13-count superseding information and accepted pleas of guilty to lesser included misdemeanor offenses from two of the three Defendants, Claude H. Purkitt and Henry A. Woods, Sr., namely violations of Regulations T and U, but without *scienter*.[4]

1. 12 Code of Federal Regulations 220 et seq. (1971).

2. 12 Code of Federal Regulations 221 et seq. (1971).

3. 15 United States Code § 78g (1934).

4. For example, Purkitt's amended judgment describes the offenses as follows:
 "IT IS ADJUDGED that the defendant upon his pleas of guilty and the Court being satisfied that there is a factual basis for the pleas, has
 been convicted of the lesser included offense of aiding and abetting others to induce a National Bank to make a loan exceeding the loan value of the collateral for said loan, in violation of 15 U.S.C. § 78g, 18 U.S.C. § 2 and 12 C.F.R. 221, as charged in count 7 of the information but with no knowledge of such rule and regulation, 15 U.S.C. § 78ff(a); and to induce a stockbroker to arrange for the extension of credit to a National Bank in

The remaining Defendant, Van de Carr, entered pleas of not guilty to all thirteen felony counts of the superseding information. During the trial the Government dismissed Count Nine on its own motion and after four weeks of presenting evidence, the prosecution rested. Whereupon Defendant Van de Carr moved for a judgment of acquittal on all twelve remaining counts, contending that the Government had failed to prove any criminal responsibility on his part, and had failed to adhere to any consistent theory of criminal liability during the presentation of its case.

The Court granted Defendant Van de Carr's motion for judgment of acquittal, directed the jury to return a verdict of not guilty as to each of the twelve counts and ordered Defendant Van de Carr discharged.

Ordinarily in a criminal case the Court does not write up the findings and conclusions which lead it to a judgment of acquittal and discharge. However, both sides have urgently requested that the Court explain in a Memorandum Opinion the thoughts and considerations which impelled it to grant the acquittal here because of possible future significance in the conduct of banking and securities firms as well as the activities of the Federal regulatory agencies, such as the Comptroller of the Currency, the Federal Reserve Board and the Securities and Exchange Commission. Moreover, the tremendous research and diligent effort that counsel for both sides have devoted to the preparation and trial of this case, with the Government vigorously contending that the Defendant's actions were flagrant examples of those abuses in the banking and securities industries which must be controlled to preserve equilibrium in the economy, and with the defense with equal vigor contending that Van de Carr had engaged in nothing criminal whatsoever, compel us to commit to paper the process by which we arrived at what we consider a proper and just result—the acquittal of Defendant.

## SUMMARY OF THE OFFENSES CHARGED

The thirteen count information filed against the three Defendants, Van de Carr, Purkitt and Woods, is summarized as follows:

Count One charged that during the period January 1, 1969 through May 31, 1969, the Defendants conspired to:

(1) purchase stock through an account in the name of Hollywood National Bank at Goodbody & Co. with funds provided by the bank in an amount in excess of the margin requirements of the Federal Securities and Exchange Act in violation of 15 U.S.C. §§ 78ff(a) and 78g, and 12 C.F.R. 220 and 221 (Regulation T and Regulation U, respectively);

(2) purchase stock through an account in the name of Hollywood National Bank at Goodbody & Co., by misapplying funds belonging to the Bank in violation of 18 U.S.C. § 656; and

(3) obtain loan funds from Hollywood National Bank which were to be used for the purchase of stock by means of a fraudulent statement, Federal Reserve Form U–1, filed with the Bank in violation of 18 U.S.C. § 1001.

Count Two charged that on or about January 13, 1969, Defendant Woods submitted a false and fraudulent Federal Reserve Form U–1 to the Hollywood National Bank and that the Defendants

---

connection with the purchase of stock in violation of 15 U.S.C. § 78g(c), 18 U.S.C. § 2, and 12 C.F.R. 220, as charged in count 12 of the information, but with no knowledge of such rule and regulation, 15 U.S.C. § 78ff (a)."

To the same effect, Woods' judgment convicted and sentenced him on Counts 3 (Regulation U) and 11 (Regulation T), with "no knowledge" thereof.

Purkitt and Van de Carr aided, abetted, counseled, induced, and secured the commission of the alleged offense.

Counts Three through Eight charged that the three Defendants caused Hollywood National Bank to make a stock secured loan for an amount exceeding 20% of the current market value of the collateral for the purpose of purchasing stock registered on the New York Stock Exchange, a national securities exchange, in violation of Regulation U.

Counts Nine and Ten charged that Defendant Van de Carr, as President of the Hollywood National Bank, in facilitating payment for the stock, wilfully misapplied money and funds belonging to the bank by causing the bank to endorse a check drawn against the bank with knowledge that the check had been drawn against insufficient funds, in violation of 18 U.S.C. § 656.

The final three counts charged all Defendants with unlawfully, wilfully and knowingly causing Goodbody & Co. to extend, maintain, and arrange for the extension and maintenance of credit to Hollywood National Bank in connection with the purchase of stock registered on the aforesaid national securities exchange, in violation of Regulation T.

## THE GOVERNMENT'S CASE

Reviewing the facts in the light most favorable to the Government and considering every reasonable inference that can be drawn therefrom, the Government's case establishes the following facts at the most:

In the early part of January, 1969, after at least two meetings at the home of Defendant Purkitt, it was agreed between Defendants Woods and Purkitt

that Woods would enjoy the benefit of Purkitt's knowledge and expertise as a securities trader. Woods and Purkitt were to split any profits resulting from this pact, but Defendant Van de Carr did not participate in these meetings and was clearly not involved in the apparent profit motives of their arrangement.

Thereafter, Woods and Purkitt met with Van de Carr and other members of the Loan Committee of the Hollywood National Bank at the Bank's offices and made arrangements for two loans, the proceeds of which were to be used in Woods' motel business. On January 13, 1969, stock purchase orders were placed through the Bank's trading account at Goodbody & Co., for the benefit of Woods and Purkitt. On the same date, the loan papers for the loan, approved by the Bank's Loan Committee, were prepared at a branch office of the Bank, because the branch office requested that the head office refer to it more loan business. The proceeds of one of the loans were released by the Bank to Woods for deposit in his motel commercial account at another bank. Shortly thereafter, Goodbody changed the address for Hollywood National Bank's stock trading account from the head office to the branch office handling the Woods loan.

The record is somewhat unclear as to the nature of the understanding, if any, which existed between the Bank and Woods and Purkitt concerning the use by them of the Bank's special stock trading cash account at Goodbody & Co. However, it is clear that by using this account at Goodbody, Woods and Purkitt were able to purchase stock on a "payment versus delivery" basis.[5]

5. "Payment versus delivery" is the colloquial reference in the securities market to the purchase of securities through a "special cash account." According to section 220.4(c) of Regulation T, in a special cash account, a creditor may:
". . . Purchase any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment." 12 C.F.R. 220.4(c) (1) (i) (1971).

On February 17, 1969, more than six weeks after the loan papers had been signed and after some of the loan collateral turned over to the Bank on January 13, 1969 in connection with the first loan had been sold for some $19,000.00, the proceeds of the second loan were released to Woods and commingled with proceeds of the sale of the collateral on the first loan. These commingled funds were subsequently used by Woods to pay for various stocks, none of which were listed on a national securities exchange.[6] The loan papers signed by Woods in January, 1969, included a Federal Reserve Form U–1 which contained a statement that the proceeds of the loan would be used for "operating cash for operation of Woods Motels, Inc. motel business."[7]

From the time of the first buy order on January 13, 1969, through mid-March, 1969, more than 45 Woods and Purkitt orders for the purchase of stocks not registered on a national securities exchange were executed by Goodbody in the Bank's special cash account. Most of these securities were delivered by Goodbody to the Bank but were paid for by Woods and Purkitt, by Charter Bank, by Santa Monica Bank, and by several individuals acquainted with Purkitt.

The first Woods and Purkitt purchase orders for stock registered on a national securities exchange were executed in early March, 1969. Now, for the first time, the margin rules of Regulation U might have become applicable. On March 19, 1969, Woods and Purkitt caused Goodbody to sell some margin stock which they had ordered but which had not been delivered. And now, for the first time, Regulation T might have become applicable. Van de Carr was ap-

parently on vacation at the time of that margin stock sale. In order to cover the purchase price of stock which they were selling before paying for its purchase, Woods and Purkitt arranged with the branch manager of the Bank to issue a cashier's check to Goodbody in the amount of the purchase price of the stock which they had sold, and to exchange the cashier's check for Goodbody's check to the Bank, representing the proceeds of the sale of the stock.

The practice of issuing the Bank's cashier's checks to Goodbody continued until late April, 1969, at which point Purkitt started the practice of drawing insufficient fund checks ["NSF checks"] on various of his "alias" accounts at the Bank in the names of his wife, step-daughter and his own Army Intelligence alias, and made them payable to the Bank. These NSF checks were then endorsed by the Bank *without recourse* and were used to pay for the securities which had been sold by Woods and Purkitt through the special cash account at Goodbody, but which had not yet been delivered and paid for.

Having learned of this substantial volume of trading activity in the Bank's special cash account, Van de Carr ordered Woods' and Purkitt's use of this account terminated on April 28, 1969, and at the same time ordered the sale of all of the Woods and Purkitt undelivered stock remaining in the account. To effect the liquidation, Woods and Purkitt induced the 49th and Western Branch of Security Pacific National Bank to issue its cashier's check for more than $288,000.00 payable to Goodbody in exchange for Goodbody's check payable to Hollywood National Bank. The latter check was then endorsed by Hollywood

---

6. For the purpose of Regulation U (12 C.F.R. 221.1), a loan secured by stock is subject to the margin limitations if it is "purpose credit." "Purpose credit" at the time in question here (1969) was credit "secured directly or indirectly by any stock" extended *"for the purpose of purchasing or carrying any stock registered*

*on a national securities exchange . . ."* 12 C.F.R. 221.3(m) (1969). [Emphasis added].

7. Form U–1 is a form required to be signed by a bank and its borrower in connection with any extension of credit secured directly or indirectly by stock. 12 C.F.R. 221.3(a) (1971).

National Bank to Security Pacific National Bank.

## THE PRINCIPAL ACTORS IN THE CASE .

In order to evaluate the case against Van de Carr, it will be helpful to consider the pertinent background of the individuals who played essential roles in the foregoing transactions.

Defendant Purkitt is a retired Army Intelligence Officer who had apparently been a very sophisticated investor in the stock market before the transactions which are the subject of this case. Although he has been involved in many disputes and lawsuits with securities broker-dealers, most of which appear to have arisen after he lost a substantial sum of money which he had invested in the now defunct San Francisco·National Bank,[8] Purkitt is still considered an attractive client by brokers, presumably because of the large volume of trading which he generates by acting in a consulting capacity to numerous persons of substantial means who desire to put their money into the stock market. For a number of years, Purkitt has transacted a substantial portion of his securities trading under various "alias" accounts, including accounts under the names of his wife, his step-daughter and his own Army Intelligence alias. In addition to his activities as a securities trader Purkitt was engaged in the loan brokerage business.

Woods is a very wealthy real estate investor who had substantial holdings in motel properties and operations. Both individually and through his motel corporations, Woods borrowed substantial sums of money from the Hollywood National Bank commencing in October, 1967. These loans were secured by personal guarantees, securities and cashier's checks, with frequent substitution of collateral. In December, 1968, Woods' loan accounts at the Bank were closed out. The record is unclear whether Woods was unhappy with the Bank's service or whether the Bank was unhappy because Woods had never transferred any of his business accounts to the Bank.

Van de Carr, the only Defendant tried on felony charges in this case, was at the time of the transactions in issue the President of the Hollywood National Bank, and the largest shareholder in the Bank. He had had extensive banking experience, *inter alia* having been instrumental in the founding of two other banks. He joined Hollywood National Bank at a time when it was on the brink of financial collapse and was largely responsible for the Bank's first profit year in 1968. The Bank's profits continued to increase under Van de Carr's management in 1969. In the latter part of 1970, the shareholders of the Bank agreed to merge it into United States National Bank, the merger being effected in July, 1971.

The wife of Defendant Purkitt, Mimi Peterson Purkitt, was the Government's principal witness. Neither her husband nor Defendant Woods was called by the Government to testify.[9] Mrs. Purkitt was present at numerous transactions placed in issue by the Government, and testified about the initial meeting between Purkitt and Woods in December, 1968; about the discussions between Purkitt and Woods concerning their arrangement to consult on the securities market and about the meetings with Van de Carr and other Bank officials to make arrangements for loans to Woods. She also testified about meetings with Harry Geyer (the branch manager of Hollywood National Bank who supervised the execution of the loan documents) when the loan proceeds were dis-

8. *See* United States v. Silverthorne, 430 F.2d 675 (9th Cir. 1970).

9. Presumably the Government would have called the codefendants to testify if the Government believed their testimony might enhance the prosecution. They were legally available to the Government because they had pleaded guilty to lesser included offenses and had been sentenced before the commencement of the trial of Defendant Van de Carr.

bursed to Woods and about meetings with Geyer to discuss settlement of numerous securities transactions through the Bank's cash account at Goodbody. Mrs. Purkitt's testimony also concerned the various meetings at Goodbody & Co., when the securities in the trading account were sold, as well as the meetings called by Van de Carr in April 1969, for the purpose of terminating the trading through the Bank's special cash account. Mrs. Purkitt's principal involvement with these transactions was the keeping of records with respect to the parties interested in the securities purchased and sold, including the division of profits, but she held a power of attorney from her daughter to effect transactions in various bank and securities accounts under her daughter's name.

Harry Geyer was the manager of the branch office of Hollywood National Bank at which the questioned loans were handled. Geyer personally supervised the preparation and execution of the documents supporting the loans to Woods and to his corporation. Geyer was a professional banker with more than forty years experience. Van de Carr had hired him in 1967 to run the branch, but before joining the Bank, he had been involved in 1965–1966 with Purkitt's loan and securities trading activities at Mission National Bank. In 1966, Geyer gave Purkitt a power of attorney over Geyer's personal trading account with a securities brokerage firm. At the Bank branch, Geyer kept track of the trading in the special cash account at Goodbody, personally delivered and picked up checks and stocks at Goodbody, and even handled Purkitt's arrangements with Charter Bank, Santa Monica Bank and Security Pacific National Bank for delivery and receipt of securities and checks. We note that in these latter transactions with other banks, Purkitt and Woods also had loans collateralized by stock but no effort seems to have been made by the Government to prosecute any of these other banks or their officers like the Government did here.

Until he was promoted to branch manager in March or April, 1969, Robert Weinman was the account executive at Goodbody & Co., who handled all of the transactions in the special cash account of Hollywood National Bank, having opened the account for the Bank in late 1968. At the time of the trial, he testified that Goodbody & Co., no longer existed as such, having been merged into the operations of Merrill Lynch, Pierce, Fenner and Smith under the compulsion of the Board of Governors of the New York Stock Exchange to avert panic in the securities market threatened by the imminent failure of Goodbody & Co. He further testified that the reason he did not freeze the account when Purkitt started selling undelivered stock which had been purchased on a "payment versus delivery" basis but was unpaid for when sold, was that he was afraid that Hollywood National Bank might not pay for the unpaid stocks which had been ordered by Purkitt.[10]

### THE CONSPIRACY CASE—Count One [11]

A conspiracy has been defined as a combination of two or more persons to accomplish some unlawful purpose or

---

10. Regulation T provides, in pertinent part, 12 C.F.R. 220.4(c) (2) (1971) that:
 " . . . In case a customer purchases a security (other than an exempted security) in a special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in subparagraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof."
 Subparagraph (7) of 220.4(c) allows the broker to afford the customer 35 days in which to make payment if the transaction is a *bona fide* payment versus delivery purchase.

11. "If two or more persons conspire . . . to commit any offense against the United States . . . and one or

to accomplish some lawful purpose by unlawful means. See Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1892). The gist of this offense is an agreement among conspirators to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). The evidence must establish beyond a reasonable doubt that the alleged conspiracy was knowingly formed, that one or more of the means or methods described in the information were agreed upon to be used in an effort to effect or accomplish some object or purpose of the conspiracy as charged, and that two or more persons, including at least one of the accused, were knowing members of the conspiracy. Mere similarity of conduct among various persons, and the fact that they have associated with each other and may have assembled together and discussed common aims and interests, do not without more, establish the existence of a conspiracy. 1 Devitt and Blackmar, Federal Jury Practice and Instructions § 23.07 (1970), and cases cited therein.

The substantive offenses alleged to have been the object of the criminal conspiracy were violations of Regulations U and T. Violation of regulations promulgated under the Securities Exchange Act of 1934 is made a criminal offense pursuant to Section 32 of the Securities Exchange Act of 1934.[12] In accepting pleas to lesser included offenses from Woods and Purkitt, the Government invoked the last clause of section

32(a) and stipulated with those Defendants that neither of them had knowledge of Regulations T and U. Van de Carr has raised a question of first impression on the conspiracy count which the Court finds quite troublesome, viz, how can the Government charge a conspiracy among three Defendants to commit an offense against the laws of the United States and then stipulate that two of them had no knowledge of the offense which is the supposed object of the conspiracy?

A conspiracy must be knowingly formed by two or more persons. The conspiracy count in the information identifies only three conspirators, all of them Defendants. After bringing this charge, and before the commencement of Van de Carr's trial, the Government reduced the degree of offense charged against Woods and Purkitt and stipulated that Woods and Purkitt did not have knowledge of the regulations, violations of which were the purported objects of the criminal conspiracy for which Van de Carr was tried. Thus, at best, the Government might have proved that Van de Carr conspired with himself. However, the Court need not decide this question because we have determined that the Government has failed to adduce evidence establishing that Van de Carr was a member of any hypothetical conspiracy to violate Regulations T and U.

Before a jury may find that a Defendant, or any other person, has become a member of the conspiracy, the evidence must show beyond a reasonable doubt that the conspiracy was knowingly

---

more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 371 (1948).

12. Section 32 of the Securities Exchange Act of 1934 provides, in pertinent part, as follows:
 "Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the

observance of which is required under the terms of this chapter, . . . shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both, except that when such person is an exchange, a fine not exceeding $500,000 may be imposed; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." 15 U.S.C. § 78 ff(a) (1934).

formed, and that the Defendant, or other person who is claimed to have been a member, wilfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy. To act or participate wilfully means to act or participate voluntarily and intentionally, and with specific intent to do something which the law forbids, or with specific intent to fail to do something which the law requires to be done. In determining whether a particular Defendant was a member of the conspiracy, if any, the trier of fact should consider only his acts and statements. See 1 Devitt and Blackmar, *supra*, § 29.05 (1970). The record is completely devoid of any evidence that Van de Carr knowingly participated in any unlawful arrangement.

Concerning the alleged violations of Regulation T and Regulation U, there was no evidence adduced at trial that Van de Carr even knew of these regulations, much less that he wilfully and intentionally violated them. In fact, each and every unaccused banker and broker who testified about his own participation in the subject transactions stated unequivocally that he did not believe anything unlawful had occurred. Parenthetically we observe that there was a surprising amount of evidence brought out during the trial that many of these very individuals who were so confident that they had not transgressed the law as bankers and brokers, were in fact much more involved with the questionable transactions than was Defendant Van de Carr.

■ The evidence the Government offered to establish that the information contained in Woods' Form U–1 was a "false statement" was also inadequate in that, as we shall more fully explain, this evidence is also susceptible to the inference that the information supplied by Woods at the time he executed the loan documents truly represented his actual intentions at that time. Whether the statement comported with what Woods eventually did with the loan proceeds when received at a substantially later time is irrelevant to the charge that Van de Carr aided and abetted Woods in making a false statement *which Woods knew to be false when he made it.*

■ The evidence produced by the Government to substantiate the charge against Van de Carr of misapplication of bank funds is also deficient in that even if the existence of overdrafts in Woods' account constituted a misapplication of Bank funds, there was no evidence that Van de Carr knew of the existence of the overdrafts, much less authorized them.

■ Looking at the evidence in the light most favorable to the Government, the strongest statement that could be made in support of the prosecution's case is that Van de Carr was associated with some of the members of the putative conspiracy, either on a social or a business level. However, a defendant cannot be found guilty of conspiracy merely by association, and his contacts with alleged co-conspirators are presumed innocent unless circumstances indicate otherwise. United States v. Kompinski, 373 F.2d 429, 434 (2nd Cir. 1967). And, of course, absent evidence that Van de Carr was a knowing member of a conspiracy to commit an offense, the acts and declarations of third persons in alleged furtherance of the conspiracy cannot be considered as evidence against Van de Carr. Cf. Carbo v. United States, 314 F.2d 718, 735–738 (9 Cir.), cert. denied 377 U.S. 953, 84 S. Ct. 1626, 12 L.Ed.2d 498 (1964), reh. denied 377 U.S. 1010, 84 S.Ct. 1902, 12 L. Ed.2d 1058 (1964).

Although the Government's case was confused by numerous material inconsistencies, the evidence did establish that Van de Carr's conduct, insofar as he dealt with the Woods and Purkitt loan transactions, was open and aboveboard. There was no evidence indicating that Van de Carr had engaged in any conduct which was in any way clandestine or likely to prejudice the best in-

terests of Hollywood National Bank. It is indeed noteworthy in this connection that Van de Carr was the officer of the Bank who terminated the use by Woods and Purkitt of the Bank's special cash account when in April 1969 he learned of the volume of trading activity that had occurred for the benefit of Woods and Purkitt. The record also established that the Bank suffered no financial loss in the transactions with Woods and Purkitt, and that no personal financial benefit was sought or received by Van de Carr in connection with any of these transactions.[13]

In summary, with respect to the conspiracy count, the Government has failed to present sufficient evidence upon which a reasonable jury might conclude beyond a reasonable doubt that Van de Carr had knowingly entered into any agreement with any person to commit any unlawful act as charged in the information.

## FALSE STATEMENT TO A GOVERNMENT AGENCY—Count Two

■ The second count of the information charges a violation of 18 U.S.C. §§ 1001 and 2, in that defendant Woods allegedly made a false statement to the Federal Reserve Board and to the Comptroller of the Currency by submitting to the Bank a false Federal Reserve Form U–1 concerning the business purpose of a $31,000.00 loan he sought from the Bank. Van de Carr and Purkitt were charged with aiding and abetting the making of the alleged false statement.[14]

The general false statement statute, 18 U.S.C. § 1001 is violated by *knowingly* and *wilfully* making a false statement on a matter within the jurisdiction of a department or agency of the United States.[15]

At the time Woods executed the allegedly false Form U–1, Regulation U provided that the bank was to "obtain and retain" the form for six years following the extinguishment of the loan.[16] The

---

13. To the extent, if any, that Hollywood National Bank earned a profit from the loans to Woods and Purkitt, Van de Carr would have benefited from the bank's business relationship with Woods and Purkitt in his capacity as holder of more than twenty percent of the common stock of the bank, but not otherwise.

14. Count two of the information charges:
"On or about the 13th day of January, 1969, in Los Angeles County, within the Central District of California, defendant HENRY A. WOODS, SR., in a matter within the jurisdiction of the Board of Governors of the Federal Reserve System and the Comptroller of the Currency, departments and agencies of the United States, did unlawfully, wilfully and knowingly make and cause to be made false, fictitious and fraudulent statements and representations with respect to material fact: to wit, in a 'STATEMENT OF PURPOSE OF THE PROCEEDS OF A STOCK-SECURED EXTENSION OF CREDIT BY A BANK (FEDERAL RESERVE FORM U–1)' submitted to the Hollywood National Bank, defendant stated and represented and caused to be stated and represented that a loan from said bank in the amount of $31,000 was for the purpose of operating cash for operation of Woods Motel,

Inc., a motel business, which statements and representations were false, fictitious and fraudulent to his knowledge in that all or a substantial portion of the proceeds of said loan was to be used for the purchase of stock.
"At said time and place, defendants CLAUDE H. PURKITT and WILLIAM VAN DE CARR aided, abetted, counseled, induced and procured the commission of the offense alleged above."

15. Title 18 United States Code § 1001 provides as follows:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1001 (1948).

16. 12 C.F.R. 221.3(a) as effective in 1969, provided in pertinent part, as follows:
"In connection with an extension of credit secured directly or indirectly by

regulation did not specifically oblige the Bank to transfer the Form U–1 to any Government agency or to notify a Government agency of its contents. Although the Government vacillated during the trial as to exactly which agency might have had jurisdiction over the U–1 Form in question, the Court need not reach that issue since there are other deficiencies in the Government's case which mandate the granting of the judgment of acquittal on this second count.

■■■ First, it is unclear what, if anything, was written on the Form U–1 at the time Woods signed it. Nor is it clear whether the blanks in that form were filled in before or after Woods signed it. There was some testimony that Woods signed the form when it was wholly blank. There was other testimony suggesting that the form was partially filled in when Woods signed it. Geyer testified that the handwritten list of stocks on the Form U–1 appeared to be in his own hand. The Government did not call Woods to the witness stand to resolve this fatal defect in their case, even though he was present during the trial.

Second, even if the form were complete when Woods signed it on January 13, 1969, the record is unclear as to whether it was a false statement, known by Woods to be false when made. There was some testimony that the statement on the form as to the purpose of the $31,000.00 loan was true when Woods signed the form on January 13, 1969. No loan was actually made until some five weeks after the statement was made and signed. The substantial period of time intervening between the signing of the Form U–1 and the Bank's making of the described loan raises a serious doubt as to whether the business purpose of the loan, as understood by Woods when he signed the Form U–1, was not honestly and truly different from the purpose to which he devoted the loan proceeds (purchase of stock) when the Bank later distributed these proceeds to him.[17]

Third, under the statute the Government must prove that the statement was *knowingly* and *wilfully* made. The Government did not and could not prove beyond a reasonable doubt that the statement was actually made by Woods, nor could they prove that it was actually false when made. *A fortiori* lacking evidence on those basic points, it was impossible for the Government to prove that the statement was made knowingly or wilfully, even if false.

any stock, the bank shall obtain and retain in its records for at least six years after such credit is extinguished a statement in conformity with the requirements of the Federal Reserve Form U–1 executed by the recipient of such extension of credit (sometimes referred to as the 'customer') and executed and accepted in good faith by a duly authorized officer of the bank prior to such extension . . . .."

17. Moreover, it is far from clear that the $31,000 loan proceeds funded the purchase of the stock which was identified on the Form U–1 as the collateral for the subject loan. The proceeds of the loan were distributed to Woods on February 17, 1969, and immediately commingled with other funds on deposit in Woods' savings account at Hollywood National Bank. The commingled funds in that account were then used to purchase unlisted stocks. At that time, Regulation U only applied to loans for the purpose of purchasing or carrying any stock registered on a national securities exchange. Thus, there was no margin restriction limiting the loan value of these unlisted stocks. In an attempt to show that Woods intended to use the subject loan to fund the purchase of stock registered on a national exchange rather than to fund the operations of his motel, the Government tried to trace the funds used to purchase the stocks listed in Geyer's handwriting on the typewritten Form U–1 to the proceeds of the loan disbursed on February 17. The Government's accounting theory and the vain attempt at tracing was arbitrary and definitely inconclusive. Application of equally acceptable accounting assumptions would support the proposition that the stocks listed as collateral in Geyer's handwriting were paid for almost entirely by funds derived from sources other than the $31,000.00 loan proceeds.

Fourth, the record is clear that Van de Carr had nothing to do with the preparation, signing, or completion of Woods' Form U–1. The entire matter was handled in the branch office of the Bank, not at the head office where Van de Carr was located. Van de Carr was only an occasional visitor to the branch and there was no testimony whatsoever that Van de Carr visited the branch during the transaction in question.

Absent a showing that Woods was guilty of a violation of 18 U.S.C. § 1001, Van de Carr could not be guilty of a vicarious violation thereof under the aiding and abetting statute.[18]

Finally, there was no evidence that Van de Carr procured the execution and delivery by Woods to the Bank of the January 13, 1969 Form U–1. In fact, there was no evidence that Van de Carr even knew of the existence of that document prior to the commencement of this prosecution.

For all of these reasons, the judgment of acquittal as to Count Two must be granted.

18. 18 U.S.C. § 2 (1948) provides as follows:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

19. 18 U.S.C. § 656 (1948) provides in pertinent part as follows:
 "Whoever, being an officer . . . of . . . any . . . national bank . . . willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both. . . ."

20. Count Ten of the information charges:
 "On or about April 25, 1969, in Los Angeles County, within the Central District of California, defendant WILLIAM VAN DE CARR, employed as President of the Hollywood National Bank, a member bank and an insured

## MISAPPLICATION OF BANK FUNDS
### —Count Ten

 The information charged Van de Carr with two counts of wilful misapplication of bank funds.[19] When the trial commenced, the Government dismissed one of the two misapplication counts. The remaining misapplication count, Count Ten, charged that Van de Carr wilfully misapplied $18,561.89 of his Bank's funds by causing it to endorse an insufficient funds check drawn against the Bank on one of Purkitt's "alias" accounts in order to pay for stock which had been purchased for the benefit of Purkitt and Woods.[20]

The records of Hollywood National Bank and Goodbody & Co. revealed a documentary chronology with respect to the $18,561.89 check as follows:

Check number 135, dated April 24, 1969, in the sum of $18,561.89 was drawn on one of Purkitt's "alias" accounts at Hollywood National Bank and was made payable to the drawee Bank. That check was then endorsed and stamped by the branch office of the

bank, as defined in United States Code, Title 18, Section 656, with intent to injure and defraud said bank, unlawfully and wilfully misapplied the sum of eighteen thousand, five hundred and sixty-one dollars and eighty-nine cents ($18,561.89), being money and funds belonging to said bank and intrusted to its custody and care, in the following manner: Defendant caused Hollywood National Bank to endorse a check drawn against said bank in the sum of eighteen thousand, five hundred and sixty-one dollars and eighty nine cents ($18,561.-89) in order that said funds could be used for the payment of 500 shares of Denny's Restaurant, a stock which had been purchased for the benefit of CLAUDE H. PURKITT, and HENRY A. WOODS, SR., with knowledge that said check had been drawn against insufficient funds in the account of C. H. Roberts, Account No. 02 003 473.
 "At said time and place, defendant HENRY A. WOODS, SR. and CLAUDE H. PURKITT aided, abetted, counseled, induced and procured the commission of the offense alleged above."

Bank with the special restriction "without recourse". Goodbody received and deposited the check; it was processed for collection on April 25, 1969, and received for payment by Hollywood National Bank on April 28, 1969. On that day it was listed on the Bank's report of items which would cause an overdraft if paid but the Bank did not dishonor the check within the time provided by law; then on April 30, 1969, Goodbody's check dated May 1, 1969, in the sum of $18,722.42 was deposited to the "alias" account of Purkitt on which the $18,561.89 NSF check had been drawn. The Goodbody check was sufficient to clear the overdraft status of the account. Moreover, on April 29, 1959, an unsecured two-day loan to Purkitt's "alias" account in the exact sum of the NSF check ($18,561.-89) was processed and posted.[21] On the following day, the day on which the Goodbody check was deposited, the loan was reversed. Because the reversal of the loan was charged on the Purkitt "alias" account before the May 1 credit arising from the April 30 deposit of the Goodbody check, the account continued in an overdraft status for one more day.

The oral testimony in the Government's case relating to the foregoing documentary chronology established the following facts. First, since Van de Carr's office was not at the branch where the daily overdraft report was located, Van de Carr did not have knowledge of the two-day overdraft in the Purkitt account. Second, on April 23, 1969, Geyer had endorsed a similar check for Purkitt, and on the following day, in Geyer's absence, his assistant branch manager had called Van de Carr for authority to endorse the $18,561.89 check which is the subject of the charge in Count Ten. Van de Carr thereupon authorized Geyer's assistant to put the "without recourse" restriction on the bank's endorsement. But this authorizing action was Van de Carr's only involvement in the life of that check and could only have protected and benefited the Bank.[22]

The Court concludes from the foregoing chronology that the Government has failed to establish beyond a reasonable doubt that Van de Carr had knowledge of the fact that the $18,561.89 check, drawn on the Purkitt "alias" account and restrictively endorsed by the Bank, was an NSF check when he authorized the branch to endorse the check "without recourse". Moreover, the honoring of the NSF check by the Bank, while it held Goodbody's May 1, 1969 check in a larger amount was not, without more, a misapplication of bank funds at all, since a mere overdraft is not a misapplication of bank funds within the meaning of 18 U.S.C. § 656. United States v. Wiggenhorn, 312 F.2d 289, 292 (9th Cir. 1963).

While the honoring of an overdraft is in effect the granting of unsecured credit to the depositor, the processing by Geyer of the brief unsecured loan in the amount of the NSF check constituted a more or less formal recognition by the Bank that it was making a short term loan to the depositor. Although the loan was processed as an unsecured loan, the evidence was that Geyer's practice was not to allow Purkitt an overdraft unless he held compensating items for deposit sufficient to cover the overdraft. The Goodbody check dated May 1, and deposited April 30 was more than sufficient to cover the Bank's liability on the NSF check. Finally, and perhaps most importantly, the negotiation of the NSF check was part of the series of transac-

---

21. Since the loan was not "secured directly or indirectly by any stock", Regulation U had no application to this loan. 12 C.F.R. 221.1(a) (1969).

22. The "without recourse" restriction of the Bank's endorsement of the Purkitt check was notice to any subsequent holder of the item that the drawee bank might not have sufficient funds of Purkitt on deposit on the date of endorsement to cover the check. So the Bank was protected as it might not have been if Van de Carr had permitted an unrestricted endorsement, or a certification or exchange of a cashier's check.

tions necessary for the liquidation of undelivered stock being held for the benefit of Purkitt and Woods in the special cash account, the liquidation having been ordered by Van de Carr on April 28, 1969, to protect the Bank. The proceeds from the sale by Goodbody were ultimately necessary to cover the Purkitt check which had to be issued to pay for the purchase of the same stock. See note 5, *supra*. Thus, the related series of transactions involving the subject NSF check did, in fact, benefit the Bank by helping to liquidate the cash account without loss to the Bank. The Court would obviously be remiss in its duty if it permitted the possibility that Van de Carr could be convicted for misapplication of Bank funds by performing an act which in fact did not harm the Bank, but rather was essential to its protection against loss.

Finally, we look in vain for the essential element of Van de Carr's scienter in these transactions. The record establishes at best a tangential and fragmentary awareness of only one of the series of occurrences, and certainly makes it clear that he had no knowledge that his authorization of "without recourse" endorsement would create any overdraft. Count Ten has not been proved.

## VIOLATION OF REGULATION U— Counts Three to Eight

■ The Board of Governors of the Federal Reserve System first promulgat-

ed Regulation U on April 8, 1936. It has been amended numerous times but this case appears to be the first one in which any court has been required to construe the regulation in a criminal prosecution.[23] The operative portion of Regulation U, as it existed during the period of the events covered by the information, is set out in the margin.[24] If an extension of credit is for the purpose of purchasing or carrying stock covered by section 221.1(a), then it is called "purpose credit". 12 C.F.R. 221.3(m) (1969).

Counts three through eight of the information charged that on certain specified dates:

"... Defendants Claude H. Purkitt, William Van de Carr, and Henry A. Woods, Sr., unlawfully, wilfully and knowingly did induce and cause the Hollywood National Bank *to make a loan secured, directly and indirectly,* by stock for the purpose of purchasing ... [stock registered on national securities exchanges], ... the *loan* being in an amount exceeding 20% of the then current market value of the collateral, in contravention of Regulation U ... ." [Emphasis added].

The evidence on the six transactions covered by these criminal charges can be summarized as follows:

1. In each instance, either Woods or Purkitt caused Goodbody & Co., to execute an order to buy securities for Hol-

23. The Government has cited several criminal cases involving alleged violations of Regulation U. However, in each case no opinion was written by the District Court or by the Court of Appeals because the defendant or defendants entered a guilty plea. Thus, there is no judicial precedent, of which this Court is aware, construing Regulation U in a criminal setting.

24. As amended on March 11, 1968, 12 C.F.R. 211.1(a) provided, in pertinent part, as follows:

"No bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a na-

tional securities exchange ... in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in Section 221.4 (the supplement to Regulation U) and as determined by the bank in good faith for credit subject to Section 221.-3(s) for any other collateral other than stocks." [Footnotes omitted]. 33 Fed. Reg. 2702 (1968).

In its present form, Regulation U, as amended July 10, 1971, regulates "margin stock" which includes not only stock registered on a national securities exchange, but also certain over the counter stocks. 12 C.F.R. 221.1, 221.3(v) and 221.3(d) (1971).

lywood National Bank's special cash account on a payment versus delivery basis.

2. In each instance, either Woods or Purkitt caused the sale of the same securities before Goodbody had obtained delivery of the securities and before payment for the purchase. Because of the logjam in Goodbody's so-called back office paperwork, the delivery of securities was often delayed for several weeks or months in 1969.

3. In each instance, Goodbody would not issue its check to Hollywood National Bank covering the proceeds of the sale until payment for the purchase of the securities was tendered to Goodbody.

4. Payment for the securities was effected in the following ways:

(a) In each of the transactions covered by Counts Three, Four and Six, Geyer (at the Bank branch) caused the issuance of the Bank's cashier's check in the amount of the purchase price of the stock, then personally delivered that check to the Goodbody office, exchanging the Bank cashier's check for Goodbody's check in the amount of the net proceeds of the sale of the same stock. In each such case, the funds represented by Goodbody's check to the Bank covered the funds paid out by means of the Bank's cashier's check to Goodbody.

(b) In the transaction covered by Count Five, Purkitt issued an NSF check on one of his "alias" accounts dated April 7, 1969. That check was honored by the Bank, with Geyer's approval, on April 9, 1969. On April 10, 1969, a secured loan was recorded in the books of the Bank branch to cover the amount of the check which had created the overdraft. The next day a Goodbody check representing the proceeds from the sale of the securities purchased with Purkitt's NSF check was deposited to Purkitt's "alias" account, and the secured loan was immediately paid off from that account.

(c) In the transaction covered by Count Seven, Purkitt purchased the securities by buying a Hollywood National Bank cashier's check with an NSF check on one of his "alias" accounts of even date. Also on the same date, Geyer exchanged the Bank cashier's check for Goodbody's check representing the securities sale proceeds. Finally, on the same day, Geyer caused Goodbody's check to be deposited in Purkitt's alias account to cover the NSF check issued earlier that day.

(d) In the transaction covered by Count Eight, an NSF check on one of Purkitt's alias accounts dated April 23, 1969, was drawn payable to Hollywood National Bank and endorsed without recourse by Geyer on behalf of the Bank. Goodbody deposited the check and on April 25, 1969, the check was honored by Hollywood National Bank; however, on that date, the Bank was in possession of Goodbody checks postdated to April 28, 1969, in sufficient amount to cover the April 23, 1969, NSF check of Purkitt.

The Government offered expert testimony that these transactions violated Regulation U under two alternative theories. First, it is said that an illegal extension of credit occurred when the purchase of securities was executed in the Bank's special cash account. Second, it was testified that a prohibited loan was made by the Bank when the Bank exchanged checks with the broker. At the close of the Government's case, the Government argued a third theory, viz. that an unlawful loan was made by the Bank when it honored the checks issued to purchase the securities.

The most obvious defect in the Government's evidence is the variance between the charge of *"a loan"* and the proof, at best, of *"an extension of credit."* Without more, such a variance between the information and the proof would suffice to justify an acquittal on those counts. Prior to March 11, 1968, Regulation U referred to "a loan." On

that date the regulation was amended to refer to "an extension of credit", a phrase which has a broader meaning than "loan." A legal expert attached to the Federal Reserve Board, Miss Janet Hart, testified that the change in the regulation was intended to prevent circumvention of Regulation U by credit devices which did not attain the formality of a bank loan.[25] However, the Government failed to frame its charges in the Regulation U counts in the light of the broadened regulatory language that became effective on March 11, 1968, about a year before the questioned transactions, and the evidence as to these counts was definitely insufficient to prove that the subject transactions ever reached the formality of a loan, even by the standards of the new Regulation, let alone under the expert's interpretation of the old and applicable Regulation.

Moreover, the Government's Regulation U case suffered from several other defects equally fatal. In Count Five it was charged that an illegal loan was made on or about April 11, 1969. The Government did not prove any exchange of checks whatsoever in connection with the purchase and sale of securities described in Count Five. Rather, the proof was that on April 11, 1969, Goodbody's check was deposited in one of Purkitt's accounts and the proceeds were used to repay a prior loan from Hollywood National Bank.

The Government urges that the exchange of checks (shown under Counts Three, Four, Six, Seven and Eight) each constituted a "clearance loan" which the Government says has been determined by the Securities and Exchange Commission to be a violation of Regulation T. The Government relies upon the case of In the Matter of Sutro Brothers & Co., 41 S.E.C. 443 (1963) as authority for this proposition. This administrative decision cited by the Government resulted from a stipulation by the broker that the Commission could make findings as permitted by law and impose an appropriate penalty upon the broker provided that the penalty did not include either revocation of the broker-dealer's registration or expulsion from membership in the National Association of Securities Dealers, Inc. In essence, the cited S.E.C. decision is in the nature of an uncontested opinion which did not result from adversary presentation of the facts nor from adversary advocacy of the applicable law. Absent more persuasive legal authority or evidence of a clear understanding in the banking community that clearance loans constitute a violation of Regulation U, this Court is unable to permit a jury to convict a defendant of felony violations under 15 U.S.C. § 78ff(a) on the evidence of exchanges of checks which exposed the Bank, at most, to the risk that Goodbody's check might not have been good.

After a careful analysis of the evidence the Court has concluded that only three actual loans were proved. But not one of them is the basis of any of the criminal charges on Counts Three through Eight of the information. The overdraft created in Purkitt's "alias" account on April 9, 1969, when Purkitt's NSF check was honored by the Bank

25. Apparently because of the complexity and novelty of some of the legal questions arising in this unique criminal prosecution for alleged violations of Regulations T and U, the Government saw fit to produce as a witness on its case-in-chief this lady lawyer from the staff of the Board of Governors of the Federal Reserve System to give what she called the "official interpretation" of various portions of the Board's regulations. Miss Hart testified that she had been associated with the Federal Reserve Board since 1958, during which time she had held the positions of Assistant Counsel, Senior Attorney and more recently "Assistant Director of the Division of Supervision and Regulation." In this last position, she is directly responsible for drafting amendments to the Board's margin regulations and recommending them to the members of the Board. She also advises Congressional Committees concerning possible amendments to the statutes under which the margin regulations are issued by the Board.

was an *unsecured* loan and is discussed above in connection with Count Five. The second loan was the secured loan recorded in the Bank books on April 10, 1969, and also discussed above in connection with Count Five. The third loan, discussed in connection with Count Eight, was the allowance of the overdraft in Purkitt's "alias" account on April 25, 1969, while the Bank was in possession of postdated checks drawn by Goodbody sufficient to cover Purkitt's overdraft. However, the Government has not urged that any of these true loans violated Regulation U. Moreover, the dates of these true loans do not correspond to the dates of the supposed loans charged as violations in the information.

Continuing our discussion of the Regulation U charges, the Court is compelled to note that what it is about to say on the issue of *scienter* in these Regulation U counts is relevant to the confusion apparent in the Government's inconsistencies in interpreting Regulation U and in the inability of the Government to adhere to a consistent prosecutive theory in pleading and proving its case. With respect to wilfulness, it should be recalled that the Government stipulated that defendants Woods and Purkitt were ignorant of Regulation U.

The record established that Purkitt was unusually sophisticated in the byways of securities trading and in the financing of such activity. While Van de Carr was shown to be an experienced banker, there was absolutely no evidence that he had knowledge of any of the transactions alleged to violate Regulation U. In fact, when Van de Carr was informed of the volume of activity in the special cash account, he ordered the immediate liquidation of undelivered stock ordered by Woods and Purkitt and held in the account for their benefit.

In a criminal case of first impression, a portion of Regulation U assumes special importance. Section 221.3(h) provides that:

"No mistake made in good faith in connection with the extension or maintenance of a credit shall be deemed to be a violation of this part." 12 C.F.R. 221.3(h) (1969)

In addition, Section 221.3(i) provides that:

"Nothing in this part shall be construed as preventing a bank from taking such action as it shall deem necessary in good faith for its own protection." 12 C.F.R. 221.3(i) (1969)

Once again the "legal expert" from the staff of the Federal Reserve Board, Janet Hart, was called upon by the Government to give her interpretation that Section 221.3(h) relates only to *mechanical mistakes*. The Court rejects this interpretation as unsupported by the pertinent language in Regulation U when contrasted with a wholly different *mistake* provision in Regulation T. Section 220.6(k) of Regulation T is captioned "innocent mistakes" and deals only with "a mechanical mistake made in good faith." [26] If the Board of Governors of the Federal Reserve System had intended to circumscribe the good faith mistake exemption in Regulation U to the narrow limits of mechanical mistakes expressed in Regulation T, it was capable of using identical—or at least similar—language. The substantial difference in language reflects a basic difference in regulatory intention.

In conclusion, the Government's case against Van de Carr for felony violations of Regulation U is insufficient for the varied reasons which have been dis-

---

26. Title 12, Code of Federal Regulations, section 220.6(k) (1969) provides:
 "If any failure to comply with this part results from a mechanical mistake made in good faith in executing a transaction, recording, determining, or calculating any loan, balance, market price, or loan value, or other similar mechanical mistake, the creditor shall not be deemed guilty of a violation of this part if promptly after discovery of such mistake he takes whatever action may be practicable in the circumstances to remedy such mistake."

cussed. The Government charged loans, but proved, at most, extensions of credit. The Government charged that the supposed loans were directly or indirectly secured by margin stock, but proved that the "loans" were never coincident in time with the holding of security. Not one of the witnesses from the banking or securities industries actively involved in the challenged transactions believed that he was participating in a violation of Regulation U. Nevertheless, the Government chose to prosecute, for wilful violation of the Regulation, Defendant Van de Carr, who was not shown to have any knowledge of the specific transactions alleged to be violations of Regulation U. Both on the substantive elements and on the element of *scienter*, the Government has completely failed to prove a *prima facie* case against the defendant Van de Carr.

## VIOLATION OF REGULATION T

Throughout the analysis of this complex case, the question recurs: why did the Government elect to prosecute Van de Carr rather than other individuals who were obviously involved in effecting the particular transactions which are charged as criminal violations by Van de Carr but engaged in by others without his knowledge? Nowhere is that question more pertinent than in respect to the last group of charges, the counts alleging violation of Regulation T.

Counts Eleven through Thirteen of the information each charge that on or about certain dates:

" . . . [D]efendants Claude H. Purkitt, William Van de Carr and Henry A. Woods, Sr., unlawfully, wilfully and knowingly did cause Goodbody & Co., a broker and dealer engaged in the transaction of business in securities to extend, maintain, and arrange. for the extension and maintenance of credit to Hollywood National Bank in connection with the purchase . . . [of stock registered on a national securities exchange] . . . in contravention of Regulation T . . . ."

The three transactions described in the Regulation T counts are the same transactions charged in Counts Six and Eight as violations of Regulation U and in Count Ten as a misapplication of bank funds.

Regulation T was first promulgated by the Board of Governors of the Federal Reserve System on December 21, 1937. The most recent amendment of the Regulation prior to the events of this case was on March 11, 1968. Regulation T "applies to every broker or dealer, including every member of a national securities exchange." 12 C.F.R. 220.1 (1969). The Securities Exchange Act of 1934 authorizes the Board of Governors of the Federal Reserve System to prescribe rules and regulations "to prevent the excessive use of credit for the purchasing or carrying of or trading in securities" and violation of such rules and regulations is made unlawful by the statute. 15 U.S.C. 78g(d) (1934). The pertinent portions of Regulation T in force in the first half of 1969 are set forth in the margin.[27]

In its effort to bring some rationality into its prosecution of the Regulation T

---

27. 12 C.F.R. 220.4(c) (1) (1969) provided in pertinent part as follows:

"In a special cash account, a creditor may effect for or with any customer *bona fide* cash transactions in securities which the creditor may: (i) Purchase any security for, or sell any security to, any customer, provided funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment . . .."
12 C.F.R. 220.4(c) (2) (1969) provided as follows:

"In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for this security within seven days after the date on which the security is so purchased, the creditor shall, except as

charges, the Government again sought assistance in the testimony of another legal expert, an SEC staff lawyer, Dennis White [28] who testified that the gravamen of the supposed criminal conduct on the part of the defendants was:

 1. Causing Goodbody & Co. to execute trades in the Bank's special cash account at Goodbody without the requisite good faith belief that the customer did not contemplate selling the securities purchased before making payment therefor; and

 2. Using influence upon Goodbody to refrain from freezing the special cash account once the Bank sold an undelivered security for which it had not previously paid the purchase price.

The SEC lawyer pointed out that the margin restrictions on extension of credit, applicable to bank creditors under Regulation U, are not the issue under the special cash account provisions of Regulation T. Rather, this part of Regulation T, which controls the broker-dealer, is concerned with the time in

provided in subparagraphs (3) to (7) of this paragraph, promptly cancel or otherwise liquidate the transaction of the unsettled portion thereof."

12 C.F.R. 220.4(c) (5) (1969) provided as follows:

"If the creditor, acting in good faith in accordance with subparagraph (1) of this paragraph, purchases a security for a customer, or sells a security to a customer, with the understanding that he is to deliver the security promptly to the customer, and the full cash payment to be made promptly by the customer is to be made against such delivery, the creditor may at his option treat the transaction as one to which the period applicable under subparagraph (2) of this paragraph is not the seven days therein specified but 35 days after the date of such purchase or sale."

12 C.F.R. 220.4(c) (6) (1969), provided, in pertinent part, as follows:

"If an appropriate committee of a national securities exchange or a national securities association is satisfied that the creditor is acting in good faith in making the application, that the application relates to a *bona fide* cash transaction, and that exceptional circumstances warrant such action, such committee, on application of the creditor, may (i) extend any period specified in subparagraphs (2), (3), (4) or (5) of this paragraph for one or more limited periods commensurate with the circumstances . . . ."

12 C.F.R. 220.4(c) (8) (1969), provided, in pertinent part, as follows:

"Unless funds sufficient for the purpose are already in the account, no security other than an exempted security shall be purchased for, or sold to, any customer in a special cash account with the creditor if any security other than an exempted security has been purchased by such customer in such an account during the preceding ninety days, and then, for any reason whatever, without having been previously paid for in full by the customer, the security has been sold in the account or delivered out to any broker or dealer: provided, That . . . ."

28. Curiously enough, Mr. White was also serving as co-counsel of record for the Government during the trial, a post which ordinarily would disqualify him as a witness. But the Court permitted him to proceed by outlining his experience with the Securities and Exchange Commission, which included present service in the Los Angeles Branch Office as an enforcement and interpretive attorney with the Division of Corporate Regulation and prior substantial service as an enforcement and interpretive attorney with the Division of Trading and Markets, which has specific responsibility for the regulation of broker-dealer activities.

With his qualifications, experience and expertise White must certainly be considered an expert, if indeed anyone no matter what his training, experience and expertise could ever be an "expert" in the maze of conflicting, contradictory and confusing regulations issued by the Federal Reserve Board, enforced by the Securities and Exchange Commission, and attempted to be used here as bases for this criminal prosecution.

The Government obviously believed, in putting him on the stand, that Mr. White was an expert. But his massively convoluted and involuted explanations and interpretations of Regulation T served only to compound the conflicts, confusions and contradictions of this Regulation, emphasizing in the Court's mind the utter fantasy and futility of this prosecution of the Regulation T charges.

which the customer must pay for the securities which he has purchased.

There were several substantial burdens which confronted the Government in this case in its attempt to establish criminal violations of Regulation T. Perhaps the most obvious difficulty is the fact that neither any broker-dealer, nor any officer or employee of any broker-dealer, was named either as a defendant or as an unindicted co-conspirator. The Government sought to justify its selection of defendants in this case with the contention that the named defendants were the individuals who ultimately caused the alleged violations to occur. But the evidence does not support that argument.

Without the knowing and wilful cooperation of Goodbody & Co., the transactions in the special cash account which are characterized as violations in the Regulation T counts would not have occurred. Goodbody and its account executive at all times had the power to freeze and liquidate the special cash account of Hollywood National Bank if they believed any violation of law was being committed. For some reason they were not motivated to freeze and liquidate the account, possibly because of the brokerage commissions generated by Woods' and Purkitt's substantial trading, but definitely not because of anything Van de Carr said or did.

Similarly, the Bank's branch manager, Geyer, had full knowledge of the trading activity being conducted by Woods and Purkitt in the Bank's special cash account at Goodbody, and Geyer did nothing to stop the activity. To the contrary, he not only faciliated it but actually participated in it to his own profit, a percentage he received out of the profits made by Purkitt and Woods. The evidence that Geyer received personal cash percentages of Woods' and Purkitt's trading profits might explain why he was loathe to terminate the special cash account privileges of Woods and Purkitt. But in no way did the Government tie Van de Carr into these dealings.

The felony violations of Regulation T charged against the three defendants also require proof of *scienter*. The Government had the burden to establish that the defendants knew of the restrictions contained in Regulation T and wilfully disregarded them. In accepting pleas of guilty to lesser included offenses from Woods and Purkitt, the Government stipulated that they were ignorant of the requirements of Regulation T. With respect to Van de Carr, the Government has produced no evidence that he knew of Regulation T or of the supposed unlawful nature of the trading activity by Woods, Purkitt and Goodbody & Co., or that he permitted or caused the trading to continue after learning that violations of Regulation T were occurring.

The record discloses that Geyer permitted Woods and Purkitt to make a large number of accommodation purchases through the Bank's special cash account which were exempt from Regulation U and executed in conformity with Regulation T prior to March 19, 1969. The first violation charged by the Government is the exchange of checks occurring on March 19, 1969, which the Government alleges constituted a sale of undelivered and unpaid for stock. Van de Carr was on vacation at that time. The exchange of checks was handled by Geyer at the Bank's branch, following a pattern of similar dealings between Geyer and Purkitt when Geyer worked at another bank three years earlier.

Goodbody's branch office manager, Robert Weinman, gave two reasons why he permitted Woods and Purkitt to sell undelivered stock which had not been paid for but which had been purchased through the special cash account more than thirty-five days before the sale. See note 10 *supra*. He testified that he understood that the regulation allowed sixty days before the broker had to freeze and liquidate the account, not thirty-five days. In addition, Weinman explained that he did not freeze the account in fear that the Bank might dishonor the purchase orders for the substantial amount of undelivered securi-

ties. This fear had substantial legal basis in view of the evidence that Goodbody assumed, without written consent from the bank, that Woods and Purkitt were empowered to instruct Goodbody & Co. to execute buy-and-sell orders in the special cash account of Hollywood National Bank. Based upon that assumption of authority in Woods and Purkitt, Goodbody had created a large backlog of undelivered securities purchased on a "payment versus delivery" basis for the account of the Bank. If Goodbody had frozen the account after thirty-five days of nondelivery of the purchased (but unpaid for) securities, Goodbody ran the risk that any loss which might have been realized by Goodbody in liquidating the Bank's account would not be at the liability of the Bank.[29]

Subparagraphs (c) (5) and (c) (6) of section 220.4 of Regulation T, note 27 *supra,* establish a procedure whereby the broker-dealer may obtain an extension of time for settlement under a special cash account beyond thirty-five days from a committee of a national securities exchange. The Government offered no evidence on this question, conceding that it was not charging any unlawful conduct in connection with the timeliness of payments.[30]

 In the face of these concessions by the Government, the Court is unable to find any evidence to support the charges in Counts Eleven, Twelve, and Thirteen that Van de Carr unlawfully, wilfully, and knowingly caused an unlawful extension and maintenance of credit to Hollywood National Bank.

A further impediment to making out a criminal case under Regulation T against the customers of a broker-dealer who are involved in a special cash account relationship appears in the "innocent mistake" provision of Regulation T. Section 220.6(k) provides:

"If any failure to comply with this Part results from a mechanical mistake made in good faith in executing a transaction, recording, determining, or calculating any loan, balance, market price or loan value, or other similar mechanical mistake, the creditor shall not be deemed guilty of a violation of this part if promptly after the discovery of such mistake he takes whatever action may be practicable in the circumstances to remedy such mistake."

Since the broker-dealer is able to avoid a criminal violation by remedying innocent mistakes, it would seem that before any customer of the broker-dealer may be found guilty of a felony violation of Regulation T, it is incumbent upon the prosecution to show that the customer had actual knowledge of the Regulation T violation by the broker-dealer and took no steps to see that the mistake was remedied.

This is especially true in light of the principle unanimously enunciated in the cases that have dealt with civil litigation involving Regulation T. The squarely imposed statutory duty of compliance with the Regulation is upon the broker-dealers and they cannot relieve themselves of this liability by attempting to assert the customer's knowledge and participation. Pearlstein v. Scudder &

---

29. Goodbody's awareness of this risk was underscored by the trial testimony of its branch office manager, Weinman, that in his earlier sworn statement to the SEC and the Justice Department, he was untruthful when he said that he only accepted orders for the Bank's special cash account from Geyer and Van de Carr. Weinman conceded that he had dissembled to the Government to put his own conduct in a better light. The fact was,

according to his trial testimony, that he took the buy and sell orders from Woods and Purkitt for the account of the Bank. Geyer also testified that he did not place any orders for Woods and Purkitt with Goodbody.

30. The conspiracy count charged that purchases in the special cash account "would result in extending the date of payment of such stock to a time beyond that normally required by Regulation T."

German, 429 F.2d 1136, 1141 (2d Cir. 1970), In re Naftalin & Co., 333 F. Supp. 136, 144 (D.Minn.1971).

In the case of Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677 (D.D.C.1971) the Court concluded that "civil liability is a helpful and beneficial adjunct to criminal and administrative sanctions in implementing the purpose of the Act, namely, deterring excessive credit transactions." 328 F. Supp. at 681. Lacking any criminal prosecutions from which to elicit guiding principles, we must of course look to the available civil decisions for assistance. Therein we find that the courts have universally accepted the axiom that the "onus of compliance" with the federal regulations is on the brokers and dealers, and not upon the customers. Pearlstein, *supra*, 429 F.2d at 1136; In re Naftalin & Co., *supra*, 333 F.Supp. at 136; Avery v. Merrill Lynch, Pierce, Fenner & Smith, *supra*, 328 F.Supp. at 677.

As was said in Moscarelli v. Stamm, 288 F.Supp. 453, 458 (E.D.N.Y.1968) in construing Regulation T, "[n]o duties or restrictions were imposed by the Act and the Regulation upon the investor-customer." This conclusion was reiterated even more emphatically in *Pearlstein, supra,* wherein the Court held that "the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit." 429 F.2d at 1141.[31]

It should be noted that in each of the above cases in which the customer was relieved of liability under Regulation T, the court was dealing with highly sophisticated and knowledgeable investors in the stock market. For this Court to find Van de Carr, a banker who had no direct dealings with Goodbody, criminally liable for violations of a regulation of which he was not shown to have any knowledge whatsoever, would be a grave injustice, and contrary to the principles which all the Federal Courts have followed.

A final and ironic note in connection with the charges that Van de Carr violated Regulation T. It was Van de Carr, not Goodbody & Co., who called a halt to Woods' and Purkitt's use of the Bank's special cash account with Goodbody & Co. Yet Van de Carr was prosecuted and Goodbody was not charged. No violation of Regulation T was proved as to Van de Carr.

## CONCLUDING CONSTITUTIONAL OBSERVATIONS ABOUT THIS UNIQUE CRIMINAL PROSECUTION

If a judgment of acquittal had not been compelled by the failures of proof identified in this opinion, the Court would have had to face the question of whether the eleven Counts here, charging conspiracy to violate and substantive felony violations of, Regulations T and U could withstand the Constitutional test of invalidity for vagueness. The Court was seriously troubled during the

---

31. In 1970, the margin requirements of the Securities Exchange Act of 1934 were amended to make it "unlawful for any United States person, or any foreign person controlled by a United States person or acting on behalf of or in conjunction with such person, to obtain, receive or enjoy the beneficial use of a loan or other extension of credit" prohibited by the margin requirements, 15 U.S.C. 78g(f) (1970), and might arguably be construed as a partial erosion of the teachings of *Pearlstein, supra,* and its progeny.

However, no cases have used subsection (f) in this manner, and the legislative history of the amendment indicates that it was passed primarily as a method of checking the circumvention of the Federal Reserve Board's regulations on margin requirements by the use of foreign banks and secret foreign accounts, practices which had become prevalent prior to the enactment of this amendment. *See* 1970 U.S.Code Cong. and Ad.News, 91st Cong., 2d Sess., Vol. 2 at 4399.

trial that it might have to decide whether it was theoretically possible to sustain a felony conviction against *any* of the defendants named in the information under the counts charging violations of Regulations T and U.

This trial was unique not only in the fact that it was the first criminal prosecution tried under Regulations T and U. In the experience of the Court, it was also unique in that the Government felt it necessary to offer expert testimony on the meaning of the Federal Reserve Board regulations. The Government produced two attorneys in the employ of Federal agencies, one from the legal staff of the Board of Governors of the Federal Reserve System, another from the legal staff of the Securities and Exchange Commission, to give their opinions on which transactions were criminal and why they were criminal. In view of the fact that several of the Government's banking and securities industries' witnesses vigorously disagreed with these Government lawyers on the existence of criminal conduct in this case, it would have been difficult for the Court to sustain a felony conviction against any defendant. If the supposed experts on the rules of regulated conduct in the employ of the Government cannot agree on what is permitted and what is forbidden, it is difficult to conclude that any of the defendants could have had the requisite specific criminal intent to violate the law which is, of course, the *sine qua non* of a felony.

The Court has accepted the request of plaintiff and defendant to file an opinion after terminating this criminal prosecution by judgment of acquittal, because it believes that the Federal agencies concerned, that is, the Federal Reserve Board, the Securities and Exchange Commission and the Comptroller of the Currency, may gain some insight from the teachings of this trial which may be helpful in refining Regulations T and U and in regulating the imposition of discipline in the banking and securities industries. During the trial, the Court's attention was directed to various statutes, regulations, and administrative rulings which were in fundamental conflict with each other. In some instances the administrative rulings of the Federal Reserve Board and the Comptroller of the Currency appear to be directly in conflict with the Federal Reserve Board Regulations T and U that formed the basis of this criminal prosecution.

The Government has vast remedial powers in the banking and securities industries short of the ultimate weapon of criminal prosecution for felony. It appears to this Court that it would have been more prudent for the Government to have proceeded in this case by way of administrative remedies. The lack of clarity in the regulatory guidelines indicates that this case was, at best, a poor vehicle by which to clarify the meaning of Regulations T and U. These rules should be elaborated in ways which make them comprehensible to the hundreds of thousands of bankers and broker-dealers in this country who must be guided by them in their every day business activities.

For the reasons set forth in this opinion, the Court had no choice but to grant defendant Van de Carr's motion for judgment of acquittal, to direct the jury to return verdicts of acquittal on all counts not theretofore dismissed on motion of the Government, and to discharge the defendant.